[Cite as *State v. Baker*, 2025-Ohio-2107.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  V.

JONATHAN J. BAKER,

    DEFENDANT-APPELLANT.

CASE NO. 13-24-42

OPINION AND
JUDGMENT ENTRY

---

Appeal from Seneca County Common Pleas Court
Trial Court No. 23 CR 0136

**Judgment Affirmed**

**Date of Decision: June 16, 2025**

---

APPEARANCES:

  *Mallorie Thomas* for Appellant

  *Derek W. DeVine* for Appellee

**ZIMMERMAN, J.**

{¶1} Defendant-appellant, Jonathan J. Baker ("Baker"), appeals the October 28, 2024 judgment entry of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} The case stems from Baker's fatal shooting of his 7-month-old daughter, an event connected to a police chase that originated in Wood County, Ohio and culminated in Baker crashing his car into a house in Seneca County, Ohio, followed by an attempt to take his own life. The incident occurred after an argument with the child's mother, during which Baker left their home with the child. He then stopped at a gun store, where he purchased a firearm (along with ammunition) after spending nearly 30 minutes inside. While in the store, Baker left the child in the parked vehicle, positioned so she would not be easily noticed. Moreover, to facilitate the purchase, Baker presented his vehicle registration due to an outdated address on his driver's license and provided a fabricated reason for acquiring the gun.

{¶3} On July 12, 2023, the Seneca County Grand Jury indicted Baker on Count One of kidnapping in violation of R.C. 2905.01(B)(1), (C)(1), a first-degree felony, and Count Two of aggravated murder in violation of R.C. 2903.01(C), (G), and 2929.02(A), an unclassified felony. The indictment included a firearm

specification under R.C. 2941.145(A) as to Count Two. Baker appeared for arraignment on July 19, 2023 and pleaded not guilty to the indictment.

{¶4} On August 18, 2023, Baker filed a motion contesting his competency to stand trial and his mental state at the time of the offense. Subsequently, on August 22, 2023, the trial court ordered a competency evaluation of Baker in accordance with R.C. 2945.371(H)(3) and (4). Following this evaluation, on October 20, 2023, the trial court determined that Baker was competent to stand trial. Later, on March 12, 2024, the trial court found that Baker understood the wrongfulness of his actions when the offenses in this case occurred.

{¶5} On May 30, 2024, Baker filed a motion for leave to amend his not guilty plea to a plea of not guilty by reason of insanity. He also submitted a written plea of not guilty by reason of insanity and requested an independent forensic examination. On June 10, 2024, the trial court granted Baker's motion to amend his plea, accepted his plea of not guilty by reason of insanity, and granted his request for an independent forensic examination.

{¶6} The case proceeded to a jury trial from September 30 to October 3, 2024. On October 3, 2024, the jury found Baker guilty of the counts and specification in the indictment. On October 28, 2024, the trial court sentenced Baker to a minimum term of 11 years in prison to a maximum term of 16 1/2 years in prison on Count One, to life in prison without the possibility parole on Count

Two, and to 3 years in prison on the firearm specification. The trial court ordered Baker serve the sentences consecutively and classified him as a violent offender.

{¶7} Baker filed his notice of appeal on November 8, 2024. He raises two assignments of error for our review.

**First Assignment of Error**

**The jury's verdict finding Mr. Baker guilty was against the manifest weight of the evidence as Mr. Baker established his NGRI defense by a preponderance of the evidence.**

{¶8} In his first assignment of error, Baker argues that his convictions are against the manifest weight of the evidence because the jury lost its way in concluding that he failed to prove his insanity defense.

*Standard of Review*

{¶9} The manifest weight of the evidence standard guides the analysis of evidentiary support for a not guilty by reason of insanity defense. *State v. Schmid*, 2025-Ohio-14, ¶ 20 (2d Dist.). In applying this standard, it is important to remember that the weight and credibility of evidence related to the insanity defense are decisions primarily left to the jury. *State v. Thomas*, 70 Ohio St.2d 79, 80 (1982).

{¶10} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction

-4-

must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Analysis*

**{¶11}** "[A] person is not guilty by reason of insanity if 'at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.'" *Schmid* at ¶ 18, quoting R.C. 2901.01(A)(14). Because it is an affirmative defense, the defendant bears the burden of proving that they are not guilty by reason of insanity. *Id.*, citing R.C. 2901.05(A) and *State v. Tibbetts*, 92 Ohio St.3d 146, 164-165 (2001). A not guilty by reason of insanity "defense must be proven by a preponderance of the evidence." *Id.* at ¶ 19, citing R.C. 2901.05(A) and *Tibbetts* at 165. "'Preponderance of the evidence simply means "evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it."'" *Id.*, quoting *In re Starks*, 2005-Ohio-1912, ¶ 15 (2d Dist.), quoting *Black's Law Dictionary* (6th Ed. 1998).

{¶12} In this case, two forensic clinical psychology experts, Dr. Richard Bromberg ("Dr. Bromberg")—on Baker's behalf—and Dr. Brian O'Reilly ("Dr. O'Reilly")—on behalf of the State—presented testimony regarding Baker's mental state at the time that the offenses were committed.

{¶13} Dr. Bromberg testified that Baker suffered from major depressive disorder with psychotic features, which impaired his ability to understand the wrongfulness of his actions at the time of the offenses at issue in this case. To reach his diagnosis, Dr. Bromberg conducted a comprehensive evaluation, including interviews with Baker's family, to understand his history and mental state leading up to the offense. Dr. Bromberg's evaluation included two psychological tests (the MMPI and the PAI), which Dr. Bromberg testified indicated that Baker was not malingering but attempting to minimize his psychological problems.[1]

{¶14} A significant part of Dr. Bromberg's testimony focused on challenging the reliability of the M-FAST, which Dr. O'Reilly had used. Relevantly, Dr. Bromberg highlighted research indicating that head trauma, such as the self-inflicted gunshot wound Baker sustained, can cause false positives on the M-FAST. He also pointed out that Dr. O'Reilly did not include a caveat in his report about Baker's head trauma and its potential impact on the M-FAST results, which was a departure from the American Psychological Association's guidelines. Importantly, Dr.

---

[1] The MMPI (Minnesota Multiphasic Personality Inventory) is a personality test used to assess symptoms of various mental disorders, while the PAI (Personality Assessment Inventory) is a clinical assessment tool that provides a comprehensive evaluation of adult psychopathology and personality.

Bromberg emphasized that Baker's head trauma was a critical factor that Dr. O'Reilly did not take into account when administering his testing. Furthermore, while Dr. Bromberg acknowledged inconsistencies in Baker's statements, which he attributed to a changing mental state over time, he also conceded that his evaluation did not include a review of the gun store surveillance video.

{¶15} Conversely, Dr. O'Reilly testified that he concluded that Baker was not experiencing a mental disease or defect at the time of the offenses at issue in this case and that Baker understood the wrongfulness of his actions. Pertinently, Dr. O'Reilly's evaluation included a review of records and an interview with Baker, during which Baker presented a version of events involving an intruder, which Dr. O'Reilly found unbelievable. Dr. O'Reilly concluded that Baker was malingering, or faking symptoms of mental illness, based on inconsistencies in Baker's accounts and the results of the M-FAST.[2]

{¶16} Dr. O'Reilly also reviewed the gun store surveillance video and noted that Baker spent approximately thirty minutes with the clerk making a handgun purchase without exhibiting any abnormal behavior, suspiciousness, paranoia, or delusional thoughts. Further, Dr. O'Reilly downplayed the significance of Baker's reported paranoia and hallucinations in jail, suggesting they were not corroborated and possibly related to his incarceration. Moreover, Dr. O'Reilly criticized Dr.

---

[2] The M-FAST (Miller Forensic Assessment of Symptoms Test) is a tool used by evaluators to assess the validity of an individual's reported symptoms of mental illness, helping to detect potential malingering.

Bromberg's methodology, particularly the administration of the MMPI test, suggesting that the way the test was administered could have influenced the results. In sum, Dr. O'Reilly's opinion was that Baker was not experiencing a severe mental disease or defect at the time of the offense and that his actions were driven by anger and vengeance.

{¶17} In addition to the experts, other witnesses testified regarding Baker's mental state. Baker's sister, Cassadie Baker ("Cassadie"), described Baker's mental decline following the death of their grandfather in January 2023, noting that Baker became withdrawn and (in March 2023) expressed suicidal ideation. Likewise, Baker's mother's boyfriend, Dale Luck ("Luck"), corroborated this testimony, providing a firsthand account of Baker's suicidal thoughts and confused state following the death of his grandfather and leading up to the incident in this case.

{¶18} Also, Baker's case manager at the Seneca County jail, Gabrielle Cesareo ("Cesareo"), testified as to the hallucinations and paranoia that Baker experienced during his confinement, including an incident where he believed someone entered his cell and injected him with something. Cesareo further noted that Baker expressed concerns about his safety and that of his family.

{¶19} On appeal, Baker argues that the jury lost its way by favoring Dr. O'Reilly's opinion and assessment over Dr. Bromberg's opinion and assessment. Specifically, Baker contends that Dr. Bromberg's assessment and opinion should have been given more weight because his evaluation was more thorough, employed

more reliable testing methods, and presented critical evidence regarding the unreliability of the M-FAST in cases with head trauma (a condition Baker experienced), which was further supported by testimony from Baker's family and Cesareo concerning his mental state.

{¶20} "The trier of fact may reject an affirmative defense on the grounds of credibility." *State v. Armstrong*, 2003-Ohio-2154, ¶ 17 (9th Dist.). *See also State v. Pence*, 2024-Ohio-5121, ¶ 38 (2d Dist.) ("The jury, as the finder of fact, may believe or disbelieve all, part, or none of a witness's testimony."). "If the record demonstrates that the trier of fact has considered the insanity defense, the reviewing court should defer to the trier of fact's interpretation of the evidence." *Armstrong*, at ¶ 17. "This is so because the jury 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Pence* at ¶ 38, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Importantly, "[a] trial court's judgment as to the defense of insanity will be reversed only where *overwhelming* and *uncontradicted* evidence to the contrary is arbitrarily ignored." (Emphasis added.) *Id. See also Pence* at ¶ 38 ("We cannot conclude that a conviction is against the manifest weight of the evidence simply because the jury believes the State's evidence over that of the defendant.").

{¶21} In this case, the jury was entitled to weigh the experts' testimonies (along with Cassadie's, Luck's, and Cesareo's testimonies) and could reasonably

have found Dr. O'Reilly's testimony more credible. *See Schmid*, 2025-Ohio-14, at ¶ 28 (2d Dist.). Critically, it was within the jury's discretion to assign credibility to the expert testimony and to determine the weight of divergent opinions. *See Armstrong* at ¶ 35. Indeed, Dr. O'Reilly's testimony provided a basis upon which the jury could discredit some of Dr. Bromberg's findings. *Compare Pence* at ¶ 39 ("Although Pence's expert opined that he was legally insane at the time of the offenses, the State's expert provided testimony upon which the jury could have relied in deciding not to credit Pence's expert.").

{¶22} Moreover, the jury assessed the credibility of Cassadie's, Luck's, and Cesareo's testimonies, which detailed Baker's deteriorating mental decline. This assessment was made in conjunction with other evidence presented at trial, including the gun store surveillance video, which offered a contemporaneous view of Baker's demeanor on the day of the incident, and the gun store employee's testimony, who testified that Baker spent approximately 30 minutes in her store purchasing a 9mm Glock pistol, and that his demeanor was nice, polite, laid back, and friendly, exhibiting no abnormal behavior or concerns. Additionally, the police body cam footage from the day of the incident captured elements of the police chase and its immediate aftermath, providing further direct visual and auditory evidence of Baker's conduct for the jury to consider. Ultimately, the jury determined that, notwithstanding the described mental decline, Baker possessed the capacity to

appreciate the wrongfulness of his conduct at the time of the incident, based on all the evidence presented.

{¶23} Thus, this case does not present *overwhelming* or *uncontradicted* evidence that Baker was unable to appreciate the wrongfulness of his conduct as a result of a severe mental disease or defect. Therefore, we conclude that the jury did not lose its way and create such a manifest miscarriage of justice that Baker's convictions must be reversed and a new trial ordered. Consequently, Baker's convictions are not against the manifest weight of the evidence.

{¶24} Baker's first assignment of error is overruled.

## Second Assignment of Error

**Mr. Baker's defense counsel was ineffective when he failed to call a crucial witness to the NGRI defense, thus Mr. Baker is entitled to a new trial.**

{¶25} In his second assignment of error, Baker argues his trial counsel was ineffective for failing to call a crucial witness to support his insanity defense.

### *Standard of Review*

{¶26} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent

representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976), *vacated in part on other grounds*, 438 U.S. 910 (1978).

**{¶27}** "Prejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Liles*, 2014-Ohio-259, ¶ 48 (3d Dist.), quoting *Bradley* at 142, citing *Strickland* at 691. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Bradley* at 142 and citing *Strickland* at 694.

*Analysis*

**{¶28}** On appeal, Baker argues that his trial counsel was ineffective for failing to call Baker's treating physician from Mercy Hospital to testify. Specifically, Baker argues that this testimony was crucial to challenge the reliability of the M-FAST results. Baker claims that without the treating physician's

testimony, the jury lacked information about the extent of his head trauma and how it could have affected the M-FAST results. Consequently, Baker argues that this prejudiced his case because the State's argument for his sanity relied heavily on the M-FAST.

{¶29} "The decision of counsel whether to call witnesses is a matter of trial strategy that will not usually be second guessed on appeal." *In re A.E.*, 2014-Ohio-4540, ¶ 35 (3d Dist.), citing *State v. Conway*, 2006-Ohio-2815, ¶ 113. Relevantly, in the opinion of trial counsel, it may be advantageous not to use a witness who, although helpful to the defendant in certain respects, could be made a harmful witness on cross-examination. *State v. Love*, 2023-Ohio-3690, ¶ 32 (11th Dist.). Thus, "debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Artis*, 2019-Ohio-2070, ¶ 39 (3d Dist.).

{¶30} In this case, Baker cannot demonstrate that the outcome of his trial would have been different had his trial counsel called his treating physician to testify. Indeed, such medical testimony could have provided the jury with important context for weighing expert opinions on the M-FAST's reliability and its link to Baker's mental capacity. Furthermore, it might have influenced how the jury viewed the credibility of Dr. O'Reilly's conclusions. Nevertheless, it remains entirely plausible that Baker's trial counsel strategically decided against calling the physician to testify. Importantly, Baker's trial counsel may have feared that the

doctor's testimony on cross-examination could have introduced information harmful to the defense, perhaps by minimizing the severity or duration of the trauma in a way that would not support Baker's claim of diminished capacity at the time of the offense. Furthermore, establishing prejudice requires more than demonstrating this doctor's testimony may have refuted the M-FAST results; rather, Baker must show how this doctor's testimony would have specifically altered the jury's credibility determination between the competing expert testimonies to a degree that undermines confidence in the outcome. Thus, this type of debatable strategic choice, even if in hindsight another approach seems preferable, does not, standing alone, establish ineffective assistance of counsel. *See State v. Awkal*, 76 Ohio St.3d 324, 337 (1996).

{¶31} Therefore, we conclude that Baker's trial counsel was not ineffective for failing to call his treating physician from Mercy Hospital to testify.

{¶32} Baker's second assignment of error is overruled.

{¶33} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**WALDICK, P.J. and WILLAMOWSKI, J., concur.**

**/hls**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

William R. Zimmerman, Judge

Juergen A. Waldick, Judge

John R. Willamowski, Judge

DATED:
/hls