[Cite as *State v. Oliphant*, 2026-Ohio-2366.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

MICHAEL L. OLIPHANT,

    DEFENDANT-APPELLANT.

CASE NO. 1-25-26

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court
Trial Court No. CR2023 0055

Judgment Affirmed

Date of Decision:  June 22, 2026

APPEARANCES:

    *Chima R. Ekeh* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**ZIMMERMAN, P.J.**

{¶1} Defendant-appellant, Michael L. Oliphant ("Oliphant"), appeals the May 19, 2025 judgment entry of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from a series of events on February 12, 2023, which began when Oliphant fired a weapon that he had purchased earlier that day at two victims, C.F. and P.L., who were standing in the parking lot of Feltz Chiropractic on Allentown Road in Lima, Ohio. Proceeding on foot from that location, Oliphant then encountered a third victim, K.P., who was seated inside a white Buick. Oliphant shot K.P. one time in the neck, causing his death. Oliphant then fled the area, discarding the firearm and ammunition in a nearby alleyway before being apprehended by law enforcement.

{¶3} On April 13, 2023, the Allen County Grand Jury indicted Oliphant on Counts One, Two, and Three of felonious assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), second-degree felonies, Count Four of murder in violation of R.C. 2903.02(A), (D), 2929.02(B), an unclassified felony, and Count Five of murder in violation of R.C. 2903.02(B), (D), 2929.02(B), an unclassified felony. The indictment included firearm specifications under R.C. 2941.145(A) as to all of the counts. On April 21, 2023, Oliphant filed a written plea of not guilty.

{¶4} On May 1, 2023, Oliphant filed a written plea of not guilty by reason of insanity. That same day, Oliphant filed a motion contesting his competency to stand trial and his mental state at the time of the offenses. Subsequently, the trial court ordered a competency evaluation for Oliphant in accordance with R.C. 2945.371(G)(3) and (4). Following this evaluation, on July 13, 2023, the trial court determined that Oliphant was competent to stand trial. Thereafter, on July 19, 2023, Oliphant filed a motion requesting a second evaluation of his mental condition at the time of the offenses, which the trial court granted.

{¶5} The case proceeded to a jury trial from April 7-11, 2025. On April 11, 2025, the jury found Oliphant guilty of Counts One, Two, Four, Five, and the accompanying specifications.[1]

{¶6} On May 19, 2025, the trial court sentenced Oliphant to a minimum term of 6 years in prison to a maximum term of 9 years in prison on Count One; to 6 years in prison on Count Two; to a mandatory minimum term of 15 years in prison to a maximum term of life in prison on Count Four; and to mandatory 3-year prison terms on the firearm specifications attached to each count.[2] The trial court ordered Oliphant to serve the sentences consecutively for an aggregate term of a minimum of 36 years to a maximum of 39 years, up to life in prison. The trial court merged Counts Four and Five for purposes of sentencing.

---

[1] The State dismissed Count Three and the accompanying specification before the start of trial.
[2] The trial court's judgment entry of sentence states only that Oliphant was sentenced to a definite term of 6 years in prison on Count One.

{¶7} Oliphant filed his notice of appeal on June 16, 2025. He raises three assignments of error for our review.

**First Assignment of Error**

**Appellant Was Denied His Right To A Fair Impartial Jury When Juror 5 Was Removed In The Middle Of Trial. (Tr. pg. 847).**

{¶8} In his first assignment of error, Oliphant argues that he was denied the right to a fair and impartial jury when the trial court improperly removed Juror 5 in the middle of the trial. In particular, he contends that the juror's brief, incidental contact with Oliphant's family to obtain a cigarette did not constitute misconduct or impair his impartiality.

*Standard of Review*

{¶9} We review a trial court's decision to remove a seated juror during trial for an abuse of discretion. *State v. Lane*, 2022-Ohio-3775, ¶ 48 (3d Dist.) ("'A trial judge is empowered to exercise "sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform [h]is duty is impaired."'"), quoting *State v. Brown*, 2012-Ohio-1848, ¶ 46 (2d Dist.), quoting *State v. Hopkins*, 27 Ohio App.3d 196, 198 (11th Dist. 1985). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

*Analysis*

{¶10} "'The right to a trial by an impartial jury lies at the very heart of due process.'" *State v. Glass*, 2024-Ohio-4535, ¶ 41 (3d Dist.), quoting *Smith v. Phillips*, 455 U.S. 209, 224-225 (1982). The constitutional right to a jury trial inherently includes the right to an unbiased and unprejudiced panel. *State v. Pruitt*, 2003-Ohio-1882, ¶ 21 (11th Dist.). Thus, trial courts bear an imperative duty to ensure *every* litigant is afforded an impartial jury. *Id.*

{¶11} To that end, "'Crim.R. 24(G) and R.C. 2945.29 address removal of jurors during criminal trials.'" *Lane* at ¶ 47, quoting *State v. Cunningham*, 2012-Ohio-2794, ¶ 45 (2d Dist.). "R.C. 2945.29 provides that the trial court may discharge a juror '[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty.'" *Id.*, quoting R.C. 2945.29. "Similarly, Crim.R. 24(G)(1) states that alternate jurors 'shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.'" *Id.*, quoting Crim.R. 24(G)(1). "Neither R.C. 2945.29 nor Crim.R. 24 requires the court to conduct a hearing to confirm the juror's inability to fulfill her service." *State v. Paul*, 2024-Ohio-1874, ¶ 39 (9th Dist.).

{¶12} Based on our review of the record in this case, we conclude that the trial court did not abuse its discretion by removing Juror 5 in the middle of trial. Decisively, a juror's improper contact or impairing relationship with a defendant's family discovered mid-trial is precisely the type of bias that warrants removal.

*Compare Pruitt* at ¶ 20 (determining that the trial court did not abuse its discretion by removing a juror after discovering improper contact with the defendant's family); *United States v. Spiegel*, 604 F.2d 961, 967 (5th Cir. 1979) (upholding the mid-trial removal of a juror upon discovering their relationship with the defendant and his family).

{¶13} Here, the record reflects that Juror 5 disclosed during voir dire that he used to date and live with Oliphant's sister and that he knew the family. Notwithstanding that prior connection, Juror 5 was seated on the jury after asserting that enough time had passed and that he could remain impartial. However, on the fourth day of trial, court security notified the trial court that Juror 5 was observed interacting with Oliphant's sister and father during a recess. Prompted by the security notification, the trial court reviewed courthouse surveillance footage, which showed Juror 5 approaching the family members on two separate occasions, conversing with Oliphant's father, and receiving a cigarette from both of them.

{¶14} Upon questioning by the trial court, Juror 5 admitted to the interactions, explaining that he approached them specifically to obtain the type of cigarette that he preferred. Despite his assurances that the contact was minimal and would not impact his ability to remain fair and impartial, the trial court excused Juror 5 and seated an alternate. The trial court reasoned that Juror 5's ability to remain impartial was compromised because he had deliberately solicited and

accepted a benefit from the defendant's family members while actively serving on the jury.

{¶15} Oliphant nevertheless contends that the trial court abused its discretion by disregarding the juror's claim that the contact was incidental. However, a trial court is not required to accept a juror's self-serving assurances of impartiality when their conduct objectively suggests otherwise. *See State v. Thompson*, 2014-Ohio-4751, ¶ 98 (acknowledging that the trial court has "discretion 'to accept [a juror's] assurances that he would be fair and impartial and would decide the case on the basis of the evidence'"), quoting *State v. Jones*, 91 Ohio St.3d 335, 338 (2001). Indeed, "[t]he trial court was in the best position to observe the juror's demeanor and evaluate his responses." *State v. Sparks*, 2014-Ohio-5788, ¶ 37 (9th Dist.). Allowing Juror 5 to remain on the panel after he solicited gifts from the defendant's family would raise a substantial question as to the jury's impartiality, and "the state is no less entitled to an unbiased determination than appellant." *Pruitt*, 2003-Ohio-1882, at ¶ 21 (11th Dist.).

{¶16} Furthermore, Oliphant failed to demonstrate that he was prejudiced by the removal of Juror 5. Indeed, to the extent that Oliphant contends that he was prejudiced because Juror 5 was the only Black juror on the panel, his argument is unavailing. Not only did Oliphant fail to raise a *Batson* challenge, but even if he had, the improper contact provided a valid, race-neutral justification for the juror's removal. Moreover, this race-neutral justification was not pretextual, as any claim

of disparate treatment fails because Juror 5 and Juror 12 (who was white) were not similarly situated. Indeed, unlike Juror 5, the contact that Juror 12 had with the victim's family was unsolicited, the juror refused to engage, and the incident was promptly reported to the trial court.

{¶17} Accordingly, the trial court's conclusion that Juror 5's conduct impaired his ability to perform his duties was not unreasonable, arbitrary, or unconscionable. Therefore, the trial court did not abuse its discretion by removing Juror 5 in the middle of trial.

{¶18} Oliphant's first assignment of error is overruled.

### Second Assignment of Error

**The Trial Court Abused Its Discretion When It Instructed The Jury On Consciousness Of Guilt. (Tr. 940-941).**

{¶19} In his second assignment of error, Oliphant argues that the trial court erred by instructing the jury on consciousness of guilt. In particular, he contends that the evidence presented at trial did not support a finding that he fled or attempted to flee the scene or discard the weapon and other items, and that the instruction unfairly prejudiced his insanity defense.

*Standard of Review*

{¶20} We review a trial court's decision to give a particular jury instruction for an abuse of discretion. *State v. Wilson*, 2010-Ohio-2294, ¶ 8 (3d Dist.). Again,

an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Adams*, 62 Ohio St.2d at 157-158.

*Analysis*

{¶21} "Trial courts are charged with giving juries 'complete and accurate' instructions that adequately reflect the issues argued in the case before them." *State v. Vasquez*, 2024-Ohio-860, ¶ 69 (6th Dist.), quoting *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992). A trial court must ordinarily give a requested jury instruction if it correctly states the law, applies to the facts of the case, and reasonable minds could reach the conclusion it seeks. *Id.*

{¶22} Courts universally recognize that a defendant's evasive actions—such as fleeing, escaping custody, resisting arrest, hiding, or using a false name—are admissible to demonstrate a consciousness of guilt, and by extension, guilt itself. *Wilson* at ¶ 9. *See also Vasquez* at ¶ 70 ("Evidence of flight is admissible to show a defendant's consciousness of guilt."). "[A] jury instruction on consciousness of guilt based upon the flight of the accused is appropriate when supported by sufficient evidence in the record." *Wilson* at ¶ 9.

{¶23} "'Flight means some escape or affirmative attempt to avoid apprehension.'" *Vasquez* at ¶ 70, quoting *State v. Herrell*, 2017-Ohio-7109, ¶ 24 (6th Dist.). "To constitute 'flight,' the defendant must 'appreciate that he has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found.'" *Id.*, quoting *State v. Sanchez-Sanchez*, 2022-Ohio-4080, ¶

177 (8th Dist.). "Under such circumstances, the jury could infer that the defendant "'is avoiding the police only because he or she knows he or she is guilty and wishes to avoid the inevitable consequences of his or her crime.'"" *Id.*, quoting *State v. Hennigan*, 2024-Ohio-404, ¶ 50 (11th Dist.), quoting *State v. James*, 2023-Ohio-3524, ¶ 62 (11th Dist.). However, mere departure from the scene does not constitute flight, as it is naturally unrealistic to expect a perpetrator to remain on-site for ready apprehension. *Id.* "'The jury may infer that such circumstances demonstrate that the accused is avoiding the police only because he or she knows he or she is guilty and wishes to avoid the inevitable consequences of his or her crime.'" *State v. James*, 2023-Ohio-3524, ¶ 62 (11th Dist.), quoting *State v. Scott*, 2022-Ohio-4054, ¶ 46 (11th Dist.).

{¶24} The probative value of flight as circumstantial evidence depends on the strength of four sequential inferences: (1) the defendant's behavior actually constituted flight; (2) the flight was driven by a consciousness of guilt; (3) that consciousness of guilt related specifically to the charged offense; and (4) the consciousness of guilt ultimately points to actual guilt for that crime. *Id.* at ¶ 61.

{¶25} On appeal, Oliphant primarily argues that the trial court abused its discretion by providing the consciousness of guilt instruction because there was insufficient evidence that he took affirmative steps to flee or conceal his weapon. In particular, he contends that the evidence did not support the consciousness of guilt instruction because "[t]here was no evidence presented to demonstrate that he

-10-

appreciated that he had been identified as a person of interest in a criminal offense and was taking active measures to avoid being found" and because he did not discard the weapon and other items to prevent them from being found. (Appellant's Brief at 13). Secondarily, Oliphant contends that the instruction unfairly prejudiced his case by conflicting with his insanity defense.

{¶26} Even though Oliphant objected to the prejudicial effect of the instruction, he did not challenge the consciousness of guilt instruction on the grounds that it was not supported by sufficient evidence. "An objection on one ground does not preserve for appeal other, unmentioned grounds." *State v. Lathon*, 2024-Ohio-5886, ¶ 123 (10th Dist.). *See also* Crim.R. 30(A) ("On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."). Consequently, we review Oliphant's sufficiency challenge to the consciousness of guilt instruction strictly for plain error. *Accord Lathon* at ¶ 123. "A court will reverse on plain error based on an erroneous jury instruction only upon a showing that the outcome "'clearly would have been different absent the error.'"" *State v. Mankin*, 2020-Ohio-5317, ¶ 18 (10th Dist.), quoting *State v. Petty*, 2012-Ohio-2989, ¶ 15 (10th Dist.), quoting *State v. Zachery*, 2009-Ohio-1180, ¶ 8 (10th Dist.).

{¶27} Because the instruction was supported by sufficient evidence, it was not error, let alone plain error, for the trial court to instruct the jury on consciousness

of guilt. Critically, the undisputed evidence established that Oliphant departed both the murder scene and the secondary shooting location outside Feltz Chiropractic, and subsequently discarded his firearm and other items. In other words, the totality of the evidence demonstrates that Oliphant's conduct extended well beyond simply walking away. That is, by leaving the scenes *and* taking active steps to dispose of the recently purchased weapon and other evidence, Oliphant demonstrated an awareness of his impending implication and made a calculated effort to avoid the consequences. *See State v. Steckel*, 2026-Ohio-979, ¶ 96 (12th Dist.) (finding that "disposing of weapons used in the offense" and "removing items from the crime scene" are proper examples of evidence establishing a consciousness of guilt independent of traditional flight).

{¶28} Moreover, determining Oliphant's true motive for leaving the scene and discarding the evidence was a matter of weight and credibility strictly within the province of the jury. *See James*, 2023-Ohio-3524, at ¶ 64 (11th Dist.) (noting that jurors, "in weighing the facts consistent with the jury instruction provided," can reasonably infer that a defendant who fired multiple shots fled because he knew he was guilty and would be sought by police). Indeed, a trial court is not precluded from providing a consciousness of guilt instruction simply because the record contains competing theories for the defendant's actions. *See State v. Lewis*, 2016-Ohio-1592, ¶ 28 (4th Dist.) (rejecting the premise that the evidence "must demonstrate only one possible motivation for a defendant's flight before a trial court

may instruct the jury on consciousness of guilt"). Therefore, because sufficient evidence supported the consciousness of guilt instruction, the trial court did not err by providing it.

**{¶29}** Further, to the extent Oliphant argues that the instruction unfairly prejudiced his case—a challenge he properly preserved at trial—the trial court did not abuse its discretion by providing the instruction. Generally, a flight instruction is "neutral in its effect" and "all but innocuous" if it advises the jury that: (1) any finding of consciousness of guilt is entirely permissive; (2) the instruction applies only if the jury first determines the defendant fled out of a consciousness of guilt; (3) the jury retains the discretion to give such evidence no weight; and (4) flight does not create a presumption of guilt. *Vasquez*, 2024-Ohio-860, at ¶ 82 (6th Dist.). "This is because such an instruction explains the limited use of flight evidence, instructs the jury to consider flight only if it finds that consciousness of guilt was the defendant's motive, and allows the jury to disregard flight evidence entirely." *Id.*

**{¶30}** Here, Oliphant does not challenge the specific language of the instruction, which was highly permissive and explicitly advised the jury as follows:

> Testimony has been admitted, indicating that the defendant did or attempted to flee the scene and/or discard the weapon and other items. You are instructed that this activity alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness or awareness of guilt. If you find that the facts do not support that the defendant did or attempted to flee the scene and/or discard the weapon and other items, or if you find that some other motive prompted the

defendant's conduct or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give this evidence.

(Apr. 11, 2025 Tr., Vol. V, at 940-941). *Compare Wilson*, 2010-Ohio-2294, at ¶ 10 (3d Dist.) (noting that "the trial court's consciousness of guilt jury instruction . . . was clearly neutral in its effect, and only permitted, not required, the jury to draw the conclusion that Wilson displayed a consciousness of guilt by fleeing the police"). Importantly, by explicitly empowering the jury to consider whether "some other motive" prompted his conduct, the instruction properly left the evaluation of Oliphant's true intent to the province of the jury. *See State v. Byrd*, 2024-Ohio-2134, ¶ 95 (7th Dist.) ("Because the instruction exclusively vests in the jury both the credibility determination (Appellant's stated purpose for leaving the motel in a taxicab) as well as its relevance to Appellant's guilt, we find the trial court did not abuse its discretion."). Consequently, because the instruction's neutral and highly permissive language explicitly allowed the jury to attribute his conduct to an alternative motive, the instruction did not unfairly prejudice Oliphant.

{¶31} Furthermore, the consciousness of guilt instruction did not conflict with Oliphant's insanity defense because the jury was free to weigh both concepts during its deliberations. *See Commonwealth v. Cardarelli*, 433 Mass. 427, 437

(2001) (finding no error in giving a consciousness of guilt instruction alongside an insanity defense since a jury may properly weigh evasive conduct when determining if a defendant lacked the capacity to appreciate the wrongfulness of his actions). *See also State v. Smith*, 2009-Ohio-1497, ¶ 14 (9th Dist.) (noting that evasive conduct "tends to demonstrate that [the defendant] understood the wrongfulness of his criminal conduct," rendering an insanity defense futile). Consequently, because the consciousness of guilt instruction was neutral, explicitly accommodated alternative motives, and did not inherently conflict with Oliphant's insanity defense, the trial court did not abuse its discretion by providing it.

{¶32} For these reasons, Oliphant's second assignment of error is overruled.

## Third Assignment of Error

**The Jury Finding That Oliphant Failed To Establish His Not Guilty By Reason Of Insanity Defense By Preponderance Of The Evidence Was Against The Manifest Weight Of The Evidence. (Tr. 981-984).**

{¶33} In his third assignment of error, Oliphant argues that his convictions are against the manifest weight of the evidence because the jury lost its way in concluding that he failed to prove his insanity defense.

### Standard of Review

{¶34} The manifest weight of the evidence standard guides the analysis of evidentiary support for a not guilty by reason of insanity defense. *State v. Schmid*, 2025-Ohio-14, ¶ 20 (2d Dist.). In applying this standard, it is important to remember

that the weight and credibility of evidence related to the insanity defense are decisions primarily left to the jury. *State v. Thomas*, 70 Ohio St.2d 79, 80 (1982).

**{¶35}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Analysis*

**{¶36}** "[A] person is not guilty by reason of insanity if 'at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.'" *Schmid* at ¶ 18, quoting R.C. 2901.01(A)(14). Because it is an affirmative defense, the defendant bears the

burden of proving that they are not guilty by reason of insanity. *Id.*, citing R.C. 2901.05(A) and *State v. Tibbetts*, 92 Ohio St.3d 146, 164-165 (2001). A not guilty by reason of insanity "defense must be proven by a preponderance of the evidence." *Id.* at ¶ 19, citing R.C. 2901.05(A) and *Tibbetts* at 165. "'Preponderance of the evidence simply means "evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it."'" *Id.*, quoting *In re Starks*, 2005-Ohio-1912, ¶ 15 (2d Dist.), quoting *Black's Law Dictionary* (6th Ed. 1998).

{¶37} In this case, two forensic psychology experts, Dr. Bob Stinson ("Dr. Stinson")—on Oliphant's behalf—and Dr. Massimo De Marchis ("Dr. De Marchis")—a court-appointed evaluator who testified on behalf of the State—presented testimony regarding Oliphant's mental state at the time that the offenses were committed. In particular, Dr. Stinson testified that Oliphant was actively psychotic at the time of the offenses and was unaware that his actions were wrong. To reach this diagnosis, Dr. Stinson evaluated a three-year history of Oliphant's severe mental illness, including his symptom manifestations, numerous psychiatric hospitalizations, and treatment records leading up to and immediately following the February 2023 incident.

{¶38} Conversely, Dr. De Marchis testified that he concluded that Oliphant was not experiencing active symptoms of a severe mental disease or defect at the time of the offenses and that he understood the wrongfulness of his actions. Pertinently, Dr. De Marchis testified that he based his opinion on Oliphant's

purposeful actions during the incident. Specifically, Dr. De Marchis pointed to the fact that Oliphant calmly purchased a firearm earlier that day, addressed the victims to get their attention before shooting, fled the scene, and disposed of the weapon and other items in an alleyway to hide evidence of the crime. Likewise, Dr. De Marchis concluded that Oliphant was fabricating his claims of seeing "demonic shadowy figures," noting that Oliphant did not report these figures initially and inconsistently claimed the figures were on foot even though he shot a victim inside a vehicle. (Apr. 11, 2025 Tr., Vol. V, at 788).

{¶39} Further, Dr. De Marchis criticized Dr. Stinson's methodology, noting that Dr. Stinson conducted his evaluation months later in October 2023 and appeared to draft his report primarily to counter Dr. De Marchis's initial findings rather than relying on his own independent review. Nevertheless, on cross-examination, Dr. De Marchis acknowledged Oliphant's extensive history of recurring mental health crises and conceded that someone with Oliphant's severe mental disease was prone to more psychotic episodes when not taking his prescribed medication.

{¶40} In addition to the experts, the jury heard testimony and viewed evidence regarding Oliphant's erratic behavior and mental state during and after the incident. Specifically, video evidence and officer testimony, including from Patrolman Bryce Bedwell, demonstrated that Oliphant made irrational, spiritual statements, stripped naked, and made multiple attempts to choke or harm himself

following his arrest. Furthermore, evidence was presented indicating that Oliphant seemed confused about whether he had actually harmed anyone, stating he was just shooting in the air. The defense also introduced records of at least nine psychiatric hospitalizations in the three years preceding the shooting.

{¶41} On appeal, Oliphant argues that the jury's determination that he failed to prove his insanity defense was against the manifest weight of the evidence because the preponderance of the evidence established that he was in an active state of psychosis. In particular, he contends that the jury arbitrarily ignored his well-documented history of mental illness, his irrational behavior during and after the shootings, and the fact that Dr. De Marchis evaluated him only after he had been stabilized on medication in the county jail.

{¶42} "'The trier of fact may reject an affirmative defense on the grounds of credibility.'" *State v. Baker*, 2025-Ohio-2107, ¶ 20 (3d Dist.), quoting *State v. Armstrong*, 2003-Ohio-2154, ¶ 17 (9th Dist.). "'If the record demonstrates that the trier of fact has considered the insanity defense, the reviewing court should defer to the trier of fact's interpretation of the evidence.'" *Id.*, quoting *Armstrong* at ¶ 17. "'This is so because the jury "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."'" *Id.*, quoting *State v. Pence*, 2024-Ohio-5121, ¶ 38 (2d Dist.), quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Ultimately, a reviewing court cannot conclude that a conviction is against

the manifest weight of the evidence simply because the jury believes the State's evidence over that of the defendant." *Pence* at ¶ 38.

**{¶43}** In this case, faced with competing psychological evaluations, the jury was tasked with resolving the conflict between Dr. Stinson's and Dr. De Marchis's conclusions. Ultimately, the jury was entitled to weigh the experts' testimonies—along with the balance of the other evidence presented at trial—and could reasonably have found Dr. De Marchis's testimony to be more credible. *Accord Baker* at ¶ 21. Critically, because the resolution of conflicting expert testimony falls squarely within the province of the jury, the jury was free to credit Dr. De Marchis's conclusions while discounting Dr. Stinson's. *Accord id.* Indeed, Dr. De Marchis's testimony gave the jury a rational basis to reject Dr. Stinson's competing diagnosis. *Accord id.* Moreover, notwithstanding the extensive evidence detailing Oliphant's history of mental illness and psychological distress while in police custody, the jury was able to assess the credibility of these accounts alongside his conduct leading up to the shooting and determine that Oliphant nonetheless possessed the capacity to appreciate the wrongfulness of his conduct at the time of the offenses. *See id*. at ¶ 22.

**{¶44}** Thus, based on the record before us, we conclude that the jury did not clearly lose its way by concluding that Oliphant failed to establish by a preponderance of the evidence that he was unable to appreciate the wrongfulness of his conduct as a result of a severe mental disease or defect. *See id.* at ¶ 23.

Therefore, the jury did not lose its way and create such a manifest miscarriage of justice that Oliphant's convictions must be reversed and a new trial ordered. Consequently, Oliphant's convictions are not against the manifest weight of the evidence.

{¶45} Oliphant's third assignment of error is overruled.

{¶46} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court. We remand this matter, however, for the limited purpose of correcting the clerical error in the May 19, 2025 sentencing entry regarding the indefinite sentence imposed on Count One.

*Judgment Affirmed*

**MILLER and WALDICK, J.J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.   The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  *See* App.R. 30.

_____

William R. Zimmerman, Judge


_____

Mark C. Miller, Judge


_____

Juergen A. Waldick, Judge

DATED:
/hls